**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IRIS CUADRA, | Civil Action No.: 09-4946 (JLL) |
| Plaintiff, | **OPINION** |
| v. | |
| UNIVISION COMMUNICATIONS, INC., et al., | |
| Defendants. | |

**LINARES**, District Judge

This matter comes before the Court on Defendants', Univision Communications, Inc. ("Univision") and John DeSimone's ("DeSimone") (collectively "Defendants"), motion for summary judgment. The Court has considered the submissions of the parties and decides this matter without oral argument pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendant's motion for summary judgment is granted in part and denied in part.

**I.    BACKGROUND**

Plaintiff Iris Cuadra ("Cuadra" or "Plaintiff") is a Hispanic-American female and former employee of Univision. Univision is a Spanish-language multimedia company, which owns and operates three leading Spanish-language broadcast television networks, as well as television and radio stations. The vast majority of Univision employees across the country are of Hispanic heritage. The company "promotes the use of Spanish language in the workplace and recognizes

that employees may choose to interact in culturally familiar ways with each other, which may include [] casual references to each other's origins or kissing on the cheek as a greeting." Defendant's Brief in Support of Motion for Summary Judgment ("Def. Brief") at 3. However, according to Defendants, if an employee regards such conduct as unwelcome and raises concerns to management, in accordance with its Anti-Harassment Policy[1], HR investigates and redresses the complained-of conduct. Def. Brief at 4.

Univision hired Plaintiff as a Sales Assistant, a clerical position designed to assist Account Executives on the Sales Team, in the New York office on September 6, 2005. In early March 2006, she was reassigned to the New Jersey office as a Traffic Coordinator; however, upon request, Ms. Cuadra was later transferred back to her Sales Assistant role in the New York office.

In early 2007, Mr. DeSimone, who is of Italian descent, offered Ms. Cuadra a position as his Executive Assistant when his prior Executive Assistant resigned, and Ms. Cuadra accepted. On or around June 16, 2007, Mr. DeSimone advocated for Ms. Cuadra to receive a salary increase of $5,000, which was ultimately approved. Defendants contend that during the first several months of working together, Ms. Cuadra and Mr. DeSimone developed an amicable working relationship. Defendants point to the fact that "on at least one occasion, Ms Cuadra e-mailed Mr. Desimone that she had 'just pinched [her] behind' after sitting on a clothes pin." Def.

---

[1] Univision's Anti-Harassment Policy provides that any employee who feels that he or she has been harassed or discriminated against based upon any of the characteristics in the Equal Employment Opportunity Policy in the employee handbook may report the alleged conduct to HR, the Legal Department, or management without fear of retaliation. Additionally, the Company provides managers with training on the Company's policies against discrimination, harassment and retaliation.

Brief at 5. However, Plaintiff avers that after becoming employed by Mr. DeSimone, she was subjected to repeated harassment, discrimination, and retaliation.

According to Ms. Cuadra, every morning and throughout the day, Mr DeSimone would kiss her, "often going out of his way to do so." Plaintiff testified that Mr. DeSimone constantly addressed her as "mi amor," "bonita," "chica," "honey-bunny," and would introduce her to others as the "Nicaraguan." Def. Brief at 18-19. Ms. Cuadra claims she objected to Mr. DeSimone's advances and tried to avoid him, often telling him she was sick or contagious. At her deposition, Ms. Cuadra testified that over time Mr. DeSimone also began inviting her to lunch, saying "[w]e need to get to know each other's wants and needs." Plaintiff's Brief in Opposition to Motion for Summary Judgment ("Pl. Brief") at 7. at Ms. Cuadra also testified that Mr. DeSimone told her he just wanted her to "be his wife at work." Pl. Brief at 2.

On or around February 8, 2008, Ms. Cuadra, Mr. DeSimone, and several members of the sales staff attended a lunch meeting. During lunch, Mr. DeSimone began inquiring about his colleagues' favorite sexual positions and even used the word "bicho," a term referring to male genitalia. Mr. DeSimone has stated the question was posed jokingly and that the other employees at the lunch laughed. Also during the lunch, a male co-worker made a comment about how cows were slaughtered and made a gesture with his hand to indicate slitting a throat. Ms. Cuadra took this as a threat from Mr. DeSimone because according to Plaintiff, this particular male co-worker "lives and dies for John." Cuadra, 172: 2-16.

On another occasion in the office, Mr. DeSimone told Ms. Cuadra that he knew "what [was] causing [his] back pain" and proceeded to draw what Ms. Cuadra believes is a picture of a penis. Mr. DeSimone disputes this characterization. According to Ms. Cuadra, Mr. DeSimone

then stood behind her chair and started thrusting as if he were having sex with her. Ms. Cuadra claims she told Mr. DeSimone that his behavior was inappropriate.

Ms. Cuadra also testified that one time Mr. DeSimone asked her to pick something up at the printing shop. When she told him that she would, he replied, "okay bitch." Plaintiff stated that she was offended by the remark and when she confronted Mr. DeSimone she told him that her teenage son would not appreciate hearing that his mother's boss had referred to her as a "bitch." In response, according to Plaintiff, Mr. DeSimone got up from his desk and gave her a hug while whispering in her ear, "you are right."

Ms. Cuadra further testified that Mr. DeSimone offered to pay her to take his niece to a club and she refused. The following day Mr. DeSimone said to Plaintiff, "too bad you didn't accept to take my niece to the club because it was an open club." He continued, "do you know that I have many friends that are gay who are leading a double life." Additionally, Mr. DeSimone once referred to a colleague as being "happy," which he told Plaintiff meant "gay."

Plaintiff alleges that Mr. DeSimone often made sexual innuendos towards her, insinuating that he would like to participate in a three-way sexual encounter with her. She further alleges that Mr. DeSimone would often make sexually suggestive sexual noises or moaning in her presence, and on one occasion did so while showing her a topless picture of himself.

On or about February 20, 2008, Ms. Cuadra complained to Tom Rottenberger ("Mr. Rottenberger"), the Senior Vice President of HR, that she felt she was being harassed by Mr. DeSimone. Mr. Rottenberger referred the matter to Deborah Barrett ("Ms. Barrett"), the Regional Director of HR for the Northeast Region, whose duties include investigating allegations of harassment.

On February 29, 2008, Ms. Barrett met with Plaintiff in person for about three hours. During the meeting, Ms Cuadra complained of Mr. DeSimone's use of nicknames, his hugging and kissing her on the cheek, and her beliefs that she and her son were being followed outside of work because Univision and/or Mr. DeSimone were out to get her. She also stated that Mr. DeSimone had personally profited through the submissions of false expense reports. Ms. Cuadra testified that during the meeting she was crying, trembling, and wringing her hands. Ms. Barrett told Ms. Cuadra that any information provided to HR would remain confidential to the extent possible in conducting an investigation.

Following her meeting with Ms. Cuadra, Ms. Barrett spoke with Mr. DeSimone in a series of calls between February and April 2008 to discuss Ms. Cuadra's complaints. HR staff interviewed the employees who attended the February 2008 lunch and who also worked on the sales team with Ms. Cuadra and Mr. DeSimone. Ms. Barrett's office also conducted a review of Mr. DeSimone's expense reports that ultimately revealed no expense improprieties. After this investigation, Ms. Barrett gave Mr. DeSimone a verbal warning to maintain a professional relationship with Ms. Cuadra. In particular, he was to stop using nicknames, and stop hugging or kissing her. Ms. Barrett testified that she informed Mr. DeSimone of the importance of Univision's anti-retaliation policy.

On April 29, 2008, Ms. Barrett reported the results of her investigation to Ms. Cuadra. Ms. Barrett explained that she had given Mr. DeSimone a verbal warning to discontinue his inappropriate conduct, but that Ms. Cuadra should keep HR apprised of any new incidents. At this point, Ms. Cuadra asked to transfer, but Ms. Barrett told her that she was unaware of any suitable vacant positions.

In May 2008, Ms. Cuadra filed an EEOC charge alleging harassment based on her gender and Nicaraguan national origin. Ms. Cuadra stated that she did so because Mr. DeSimone's conduct had not stopped and Univision had not taken "swift and effective action." Pl. Brief at 9. Univision then reopened its investigation of Ms. Cuadra's claims. On July 29, 2008, Ms. Barrett issued a written warning to Mr. DeSimone about the need for professional conduct and reminded Mr. DeSimone of the company's policy against retaliation.

Defendants claim that upon filing her EEOC charge, Ms. Cuadra ceased to perform her assigned duties. Defendants claim that Ms. Cuadra delayed booking conference rooms, bickered with the Facilities Manager about ordering supplies, and once declined to answer Mr. DeSimone's phone because she was tying her shoe. Defendants also claim that Ms. Cuadra began complaining about her coworkers constantly tapping her on the shoulder to get her attention, even though she had always sat with her back to the entryway. As such, Defendants contend that this conduct constitutes an undisputed record of unacceptable performance by an Executive Assistant. However, Ms. Cuadra maintains that once she went to Human Resources she was subjected to retaliation. She testified that her work schedule changed, her overtime was revoked, and she became completely isolated by her coworkers due to Mr. DeSimone's influence.

On or about November 25, 2008, Mr. DeSimone and Ms. Barrett met with Ms. Cuadra to review her 2008 performance evaluation. Mr. DeSimone stated that Ms. Cuadra displayed poor interpersonal skills and lacked initiative. As examples, Mr. DeSimone stated that Ms. Cuadra did not respond to a question from the Facilities Manager during a fire drill and that he was concerned with Ms. Cuadra handing documents to co-workers over her shoulder rather than

facing them.  He also stated that he had received complaints regarding Ms. Cuadra's phone etiquette.  Plaintiff points out that despite working at Univision since 2005 and receiving two salary increases that Mr. DeSimone advocated for, she only ever received a poor performance review after lodging her complaints about Mr. DeSimone with HR.  Mr. DeSimone admits that after the EEOC complaint was filed, he was suspended for two days without pay.  DeSimone, 218:1-4, 215:4-25.

Even though Ms. Cuadra objected to Mr. DeSimone performing her evaluation, at no time did Univision's administration suggest that it should instead be conducted by Mike Perceccante, another supervisor for whom Ms. Cuadra worked.  According to Barrett, DeSimone forwarded Barrett a proposed employee performance evaluation for Cuadra, in which he had evaluated her.  Barrett testified that she had to make revisions to DeSimone's original evaluation to tone it down and "take out the emotion."  Barrett, 136:13-25, 137:1-5.

Once Mr. DeSimone left the evaluation meeting, Ms. Cuadra requested a transfer.  Ms. Cuadra claims that this request was repeatedly made and denied.  Defendants claim that Ms. Cuadra was told she was welcome to apply for any open positions.  Ms. Barrett has testified that she "didn't feel that the - the nature of this was at a level where it was really required."  Barrett, 113:14-23.  Ms. Cuadra then asked if she could move her workspace further away from Mr. DeSimone and Ms. Barrett said she would look into the availability of other office space.  Ms. Barrett testified that she sought other workspace for Ms. Cuadra, but only on the same floor of the building despite the fact that people from other departments were sitting on that floor.  Cuadra: 290:18-25. Defendants claim that the only available space required Ms. Cuadra to work near other employees about whom she had previously complained.  On December 3, 2008, Ms.

Barrett informed Ms. Cuadra about the lack of alternative workspace via e-mail.

At this same meeting, Ms. Cuadra asked Ms. Barrett if she could ask Mr. DeSimone to hang his jacket in his own office rather than her cubicle. Mr. DeSimone agreed to do so, but according to Ms. Cuadra, shortly thereafter, he resumed hanging his jacket in her cubicle.

In November 2009, the Univision's corporate headquarters mandated a reduction-in-force ("RIF"). Ramon Pineda, WXTV Channel 41's Vice President General Manager, began evaluating positions that could be eliminated. He consulted with both Mr. DeSimone and Ms. Pineda regarding the selection. Mr. DeSimone testified that he was the one who suggested that Ms. Cuadra be laid off as part of the RIF because of the issues he had raised during the performance review. Defendants claim that the decision to terminate Ms. Cuadra was due to the fact that Ms. Cuadra was one of only two Executive Assistants to local station General Sales Manages left in the entire station group of the Company. Further, eliminating an Executive Assistant would have less impact on client relations on sales than comparable Sales Associate positions. Also, Defendants claim that Ms. Cuadra's poor performance evaluation was also a factor in her termination. Ms. Cuadra testified that in February 2009, she was advised that her position was being eliminated and that her termination was recommended by Mr. DeSimone.

After Mr. Pineda, Ms. Barrett and Mr. DeSimone collectively determined who would be released, company in-house counsel approved the list. On February 27, 2009, Ms. Cuadra and four other employees were laid off. Another employee's position was eliminated and she agreed to accept a lower-paying post.

Mr. DeSimone was terminated on May 19, 2010. Defendants claim that his position was eliminated as a result of a subsequent RIF.

## II. LEGAL STANDARD

A court shall grant summary judgment under Rule 56© of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. The moving party first must show that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party. To present evidence that a genuine issue of material fact compels a trial. Id. at 324. The non-moving party must offer specific facts that establish a genuine issue of material fact and may not simply rely on unsupported assertions, bare allegations, or speculation. See Ridgewood Bd. of Educ. v. N.E. ex. rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Also, the Court must consider all facts presented and the reasonable inference drawn in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbit, 63 F.3d 231, 236 (3d Cir. 1995).

## III. ANALYSIS

### A. Hostile Work Environment Claims

In order to establish a hostile work environment, Plaintiff must show that she "(1) suffered intentional discrimination because of her [gender and/or national origin]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person of the same [gender and/or national origin] in that position; and (5) the existence of respondeat superior liability. Kunin v. Sears Roebuck Co., 175 F.3d 1469, 1482 (3d Cir. 1990). It is well-established that "conduct that

is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview.'" Shramban v. Aetna, No. 03-2742, 2004 U.S. App. LEXIS 23374, at *4-5 (3d Cir. Nov. 8, 2004) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). Whether a sufficiently "pervasive" hostile work environment exists is an *objective* determination, to be reached in view of the totality of the circumstances, including "'the frequency of the . . . conduct, its severity, whether it is physically threatening or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance.'" See Saida-Kamara v. Parkway Corp., 155 F.Supp. 2d 436, 439 (E.D. Pa. 2001) (quoting Harris, 510 U.S. at 23). Thus, by making a motion for summary judgment, Defendants ask this Court to find that, given the instant facts, there is no question that Mr. DeSimone's acts did not constitute sexual harassment that was so pervasive and continuous as to constitute a hostile work environment. This Court declines to make that finding.

Defendants contend that Plaintiff's allegations are not actionable because (1) Plaintiff has not established that an objective person would be offended by the same acts; (2) the majority of her complained-of comments cannot be tied to Ms. Cuadra's gender or national origin; and (3) that Mr. DeSimone's conduct was never sufficiently pervasive or severe.

Plaintiff's third argument is misguided because it attempts to analyze each individual act as being distinct in an effort to undermine its pervasiveness. However, finding a hostile work environment requires an examination of the totality of the circumstances. Saida-Kamara v. Parkway Corp., 155 F.Supp. 2d 436, 439 (E.D. Pa. 2001). Thus, the fact that Mr. DeSimone may have only called her a "bitch" one time does not mean that he did not otherwise display a pattern

of continuous and harassing behavior.

To the contrary, Plaintiff has established that from early 2007 until her termination in February 2009 she was barraged with sexual innuendo and unwanted touching from her immediate supervisor. Namely, according to Ms. Cuadra, Mr. DeSimone would kiss her everyday, often going out of his way to do so and constantly refer her to by names intended to reference her gender or national origin such as "bonita" or the "Nicaraguan." He also referred to her as "bitch" on more than one occasion and sometimes in front of other colleagues. At an employee lunch meeting, Mr. DeSimone inquired about his colleagues' favorite sexual positions and used the term "bicho." On another occasion, Mr. DeSimone drew a picture of his genitalia and then proceeded to mime sexual acts in front of Ms. Cuadra at the office.

As if these acts were not sufficiently pervasive and continuous, he also asked Ms. Cuadra to take his niece to a night club that he stated she might enjoy because it was an "open," meaning gay, club. He told her that many of his gay friends were leading double lives. Mr. DeSimone would also often make sexually suggestive noises in her presence and on one occasion did so while showing her a topless picture of himself. He also told her that he would like to participate in a three way sexual encounter with her.

An objective reading of the record presents an image of Mr. DeSimone as a consummate harasser, and of Univision as a workplace that is regularly permeated with sexual comments, physical touching and name-calling, both by employees and supervisors. At the very least, there are genuine issues of material fact as to whether Mr. DeSimone's behavior created a hostile work environment. Thus, Mr. DeSimone is not entitled to summary judgment on Ms. Cuadra's hostile work environment claims.

The Court is also not in a position to find that Univision did not create or encourage a hostile work environment.  An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.  Faragher v. City of Boca Raton, 524 U.S. 775, 777 (1998) ("It makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by the use of his supervisory authority . . .").  However, "the imposition of liability based on the misuse of supervisory authority must be squared with [the idea] that an employer is not 'automatically' liable for harassment by a supervisor who creates the requisite degree of discrimination."  Id.  Rather, an employer may raise an affirmative defense that looks to the reasonableness of the employer's conduct in seeking to prevent and correct the harassing conduct and to the reasonableness of the employee's conduct in seeking to avoid harm.

In this case, the Court finds that there is a question of fact as to whether Univision took reasonable steps to prevent and correct Mr. DeSimone's continued harassing conduct.  Defendants contend that Univision took adequate remedial action in response to Ms. Cuadra's complaints; namely, that HR conducted investigations of the complained-of incidents and issued a verbal warning to Mr. DeSimone.  Nevertheless, Mr. DeSimone's harassing behavior continued beyond the verbal warning.  When Ms. Cuadra asked to change departments or office space, all such requests were denied because according to Defendants no appropriate vacancies or office spaces were available.

Notably, Defendants concede that in 2006, when Ms. Cuadra asked to be transferred from New Jersey back to the New York office because she was simply "unhappy," Defendants almost

immediately accommodated her request. However, when her request to transfer was made after repeatedly complaining about a harassing supervisor, Defendants claim there was no room for movement. Also, Ms. Barrett has testified that she "didn't feel that the - the nature of [Cuadra's complaints were] at a level where [a transfer] was really required." Barrett, 113:14-23. The disparity between Defendants reactions to each respective transfer request undermines Defendants contention that they took reasonable steps to alleviate Ms. Cuadra's complaints, and creates a question of fact that makes this Court unable to grant Defendants' motion for summary judgment.

      B.      **Discrimination and Retaliation Claims**

Title VII prohibits retaliation for opposing an unlawful employment practice. 42 U.S.C. § 2000e-3. To establish a *prima facie* case of retaliation, a plaintiff must prove that (1) she engaged in protected activity, (2) an employer took an adverse action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse action. Wilkerson v. New Media Tech. Charter School, Inc., 522 F.3d 315, 320 (3d Cir. 2008). An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 152-53 (3d Cir. 1999). (internal quotations omitted).

Defendants contend that Mr. DeSimone's verbal statements, hugging and kissing of Ms. Cuadra, and the drawing incident are not actionable because they cannot be tied to her national origin or gender. This Court disagrees. An objective reading of the record demonstrates the

completely contrary conclusion; namely, that most if not all of Mr. DeSimone's statements and actions were taken because of her gender and national origin. For example, calling Ms. Cuadra "the Nicaraguan" is nothing if not an explicit reference to her national origin. Defendants also concede that Mr. DeSimone called Ms. Cuadra: "bonita," "honey-bunny," "chica," and "osita" (meaning "lady bear"). All of these nicknames, particularly the Spanish ones, explicitly implicate Ms. Cuadra's female gender. Further, there is no evidence on the record that Mr. DeSimone employed comparable nicknames when interacting with his male colleagues nor did he regularly hug or kiss them.

Additionally, Defendants claim that the drawing incident is not actionable because the drawing intends to represent Mr. DeSimone's vertebrae, and not, as Ms. Cuadra contends, Mr. DeSimone's genitalia. However, therein lies a question of fact that makes Ms. Cuadra's discrimination claims inappropriate for resolution at the summary judgment stage.

As to Ms. Cuadra's retaliation claims, as stated, an employer may raise an affirmative defense that looks to the reasonableness of the employer's conduct in seeking to prevent and correct the harassing conduct. However, "no affirmative defense is available when the supervisor's harassment culminates in a tangible employment action such as *discharge*, demotion, or undesirable reassignment." Faragher, 524 U.S. at 778 (emphasis added).

Defendants point to the fact "that Ms. Cuadra was one of only two Executive Assistant left in the entire station group of the Company" as evidence that "Ms. Cuadra was a logical choice for inclusion in the [] RIF." Def. Brief at 14. However, the Court notes that the other Executive Assistant whom Defendants referenced was not also terminated in the RIF. Although Defendants have provided the names and national origins of the other employees who

were terminated in the RIF, Defendants provided no indication as to how the other terminated employees scored on their performance reviews or interacted with other workers; all of which are factors that Defendants claim were instrumental in the decision to release Ms. Cuadra in the RIF.

Also, Defendants contend that Ms. Cuadra's poor performance evaluation was a factor in their decision to terminate her. However, even though Ms. Cuadra objected to Mr. DeSimone performing her evaluation, at no time did Univision's administration suggest that it should instead be conducted by, Mike Perceccante, another supervisor for whom Ms. Cuadra worked. In fact, according to Ms. Barrett, DeSimone forwarded Barrett a proposed employee performance evaluation for Cuadra, in which he had evaluated her. Barrett testified that she had to make revisions to DeSimone's original evaluation to tone it down and "take out the emotion." Barrett, 136:13-25, 137:1-5.

In light of Defendants' concession that Mr. DeSimone suggested that Ms. Cuadra be terminated as part of the RIF, this Court cannot grant summary judgment without further information as to how the other termination decisions were ultimately made. The Court is in no better position to assume that, as Defendants contend, all of these employees were terminated as part of a cost-saving measure, than it is to assume that all of these employees were terminated in one larger retaliatory act by Univision.

As such, Defendants' motion for summary judgment as to the discrimination and retaliation claims is denied.

    **C.    Intentional Infliction of Emotion Distress ("IIED") Claims**

To establish an IIED claim, Ms. Cuadra must allege conduct "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency." Buckley v. Trenton

Saving Fund Soc., 111 N.J. 255 (1988)).  In addition, Plaintiff must show that Defendants acted intentionally or to "act and to produce emotional distress," that Defendants' actions "proximately caused" the distress, and the distress must be so severe that "no reasonable [person] could be expected to endure it." Id. at 366.  It is rare to find conduct in the employment context that will satisfy this very high standard and this case is no exception.  Although questions remain as to whether Mr. DeSimone's conduct was so harassing that it created a hostile work environment, and as to whether Univision acted reasonably in attempting to remedy Ms. Cuadra's complaints; taking all of Ms. Cuadra's allegations as true, these allegations do not constitute behavior that is so extreme that a reasonable person could not endure it.  As such, Defendants' motion for summary judgment on Plaintiff's intentional infliction of emotion distress claims is granted.

### IV.	CONCLUSION

For the reasons sets forth above, Defendants' motion for summary judgment on Plaintiff's hostile work environment claims, and discrimination and retaliation claims is denied.  Defendants' motion for summary judgment on Plaintiff's intentional infliction of emotional distress claim is granted.  An appropriate order accompanies this Opinion.

DATED: September 1, 2011

					s/ Jose L. Linares
					JOSE L. LINARES
					U.S. DISTRICT JUDGE